Good morning ladies and gentlemen. Judge Williams and I are very pleased to have sitting with us today Judge Andrea Wood of the Northern District of Illinois to help us with our case Tilstra v. BouMatic, is that pronounced correctly? Anyway, Mr. Glazer. May it please the court. The district court erred because there was no contractual injury and Tilstra's expert opinion was not reliable. Breach of good faith, which was the only claim that went to the jury, requires a contractual injury, not a threatened injury. Threatened injuries only relate to an anticipatory repudiation or a claim of economic duress. Plaintiff's counsel, as part of summary judgment, specifically indicated economic duress was not part of their claim. Well look, this is a very complicated case. I have to explain it simply, okay? Rather than starting in the middle. Sure. The plaintiff filed a case for constructive termination because prior to Tilstra selling its business, BouMatic went to them on November 16, 2009 and said, we are going to take away your territory. If you want to sell before we take away the territory, you need to give us a tentative answer by December 1, 2009 and you have to have a closing by January 1, 2010. That's all BouMatic did in this entire case. But didn't they say that the change was not negotiable and that BouMatic would proceed with or without Tilstra's cooperation? Correct. If Tilstra did not sell, then there would have been a termination which is allowed under the agreement upon 90 days notice and good cause. But before the termination provisions ever came into play, they simply had a meeting and they said, look, we think it's a good idea for you to sell your business because we're going to terminate you and if you want the opportunity to sell, give us an answer by January 1. Counsel, haven't you left out the important fact that they also contacted one of Tilstra's competitors and made sure that they were aware of the situation and that there appears to be evidence in the record that BouMatic actually collaborated with the competitor to try to force this sale through. Why isn't that significant and why doesn't that smack of bad faith? Because that wasn't part of the case. The case had not, he had filed a tortious interference claim that was dismissed as part of the statute of limitations. The jury instruction was twofold. First, the communications starting on November 16th that BouMatic made to Tilstra or lack of communications, that was part one that could support the breach. The second piece was constructive termination. There was no constructive termination in this case. There's a case right on point, John Deere, that says you cannot have constructive termination without economic duress. This whole pseudo conspiracy with Dortmans was never what was in front of the jury. The jury was, you can't have an injury because BouMatic tells a competitor that they're going to be able to purchase the business. That was the whole negotiation. You're really hurt by your emails. Excuse me? You're really hurt by your emails. Okay, the emails, there's two emails. The first email, which was allegedly part of the bad faith, but which was removed because in the final pre-trial instruction conference, the court said anything before November 16th has nothing to do with the case. There's an email that was at 9 o'clock at night and said, hey, we're going to go tell Tilstra they should sell, but if they don't do that, we'll shrink their territory. The agreement allowed us to shrink the territory. There are three territories. Dortmans is right here, Tilstra is right here, and Advance is right here. Tilstra had the most cows, and at BouMatic's discretion, it could change the territory. Tilstra had the most cows and the least sales, and so it was within BouMatic's discretion to do exactly what they threatened to do. But before the meeting on November 16th, they dropped the idea. So you can't have an internal email communication, which is a suggested idea, which is never implemented, create a contractual injury. If I say, I think I have this idea. You say you want to put undesired, you want to put unbearable pressure on Sid without canceling him outright or immediately. Right, but they didn't. Why do you want to cancel him by exerting unbearable pressure rather than canceling him outright? They didn't implement that idea. They didn't shrink his territory. Instead, the other person, John Jay, thought that was a poor idea because it would cause conflict in the market. So that email was simply an idea that was never implemented. Well, if it had been implemented, would that have been unlawful, or would that have been fine? If they had implemented that idea, it still wouldn't have been unlawful because if you can follow the express terms of the contract, which allows BouMatic to change the territory in its own discretion. But of course, it makes the contract fictional because it says that you don't have to have any cause to cancel. You just shrink the franchisee's territory to zero, and then he's crushed. If you shrunk the territory to zero, at some point between shrinking the territory, in this case, they were just going to change the territory lines and adjust the territory lines because at the fringes, the customers were complaining about Tilster. There's an hour and a half radius that you can operate in Canada and service farmers because they need someone there immediately. So there was this hour and a half radius, and Dortmans was already selling in Tilster's territory because they sold a different product line where they were allowed to sell in Tilster's territory. So the boundaries were getting complaints because those people didn't want to work with Tilster because Tilster was a terrible dealer, and he was charging too much. So the idea that they were going to shrink the territories was just moving the territory lines to readjust the territory lines. Well, if he's a terrible dealer, why didn't you cancel him for cause? The problem they would have if he hadn't sold, but if you cancel a dealer for cause, you have to give them 90 days notice. That puts the 120 customers in Tilster's territory at the mercy of the other competitors to take those customers. So what they were trying to do and what they thought they did was go to Tilster and said, look, you have a way to get money out of this dealership. Before we terminate you, if you want to sell, sell. And that's all that was. But what you're saying is you shouldn't have had that 90-day provision. No, no, the 90-day provision is fine. No, you're saying that that would be ruinous if he had had the 90 days and all the customers would have been upset. They would have risked that, but they would have had the risk. So why do you have the 90-day provision in there? They have the 90-day provision. This is a Canadian dealership. They're Canadian laws, which arguably can apply. So they put the 90-day clause in to conform with that. And at the time the dealership was written. Well, you say, all right, so they have to have the 90-day provision, but you say they can eliminate it by shrinking his territory. Within reason, if they shrunk it to zero, then at some point that would be considered a constructive termination because he couldn't do business. The other issue in this whole thing is the territory is kind of illusory because in Canada you can't force a farmer to buy from a specific dealer. So all the dealers could sell to any farmer. The only thing the territory did was it meant that Dortmans couldn't solicit into Tilster's territory. But if a farmer in Tilster's territory asked Dortmans to service them, they could. The only practical limitation was the one-and-a-half-hour radius. What happened here, Your Honor, is we moved for summary judgment because there was no economic duress. This case has always been a constructive termination based on an alleged forced sale. To have a forced sale, you need economic duress. We went to the judge. We moved for summary judgment. The John Deere case is 100% on point. In John Deere they said you have 90 days to sell this other dealer, and so then the dealer sold within the 90 days, and then sued and said, well, I was forced to sell. And there's four elements of economic duress that were never met. And so to get around summary judgment, the plaintiff said, well, we're not going for a forced sale. We're not trying to prove economic duress. So the case went to trial on two issues. Number one, constructive termination, which you can't have without economic duress, and they admitted they had no economic duress. And the other issue was the communication starting on November 16th, and the only communication was that you should sell before we terminate you, which was not any violation of the agreement. What they've done is they've blended anticipatory repudiation, which if we had said if you don't sell by January 1st, you're fired on January 1st, that would have been the first part of an anticipatory repudiation claim. Then they would have said, good, we're not going to sell. You just breached the contract. That would create a breach. We never told them if they didn't sell by January 1st they would be fired on January 1st. They're conflating the deadline to tell us whether or not to sell with when the territory removal would be. Well, didn't you say that they needed to have an agreement in place by December 1st, 2009, with the takeover date of January 1st? They needed a tentative agreement by December 1st and a closing by January 1st, which never happened. That date passed. That's why we sent them a letter on January 8th and said, hey, we told you you needed to tell us by December 1st about a tentative deal and a closing by January 1st. That date passed. And so January 8th we said, what's the status of the negotiations? He emailed back. He said, I'm working on a fair deal. And our last email on January 11th was, we're glad that you're trying to work out a deal. The way to prove this case and why it's frivolous is let's just assume they said no to us. We're not selling. On January 11th they said, I'm working on a fair deal. They said no. There would be no contractual breach on January 11th because they were still in business. We never stopped selling them product. We never did anything to constructively terminate the agreement. So if they had said no to us on January 11th and we didn't terminate the agreement and we didn't breach the agreement, by saying yes, they can't, by agreeing and acquiescing under John Deere, they can't impose a breach on us because they agreed with our strategy that it's better for them to take some money before we implement termination provisions. We have an email on November 16th. On November 16th, when we're driving up to the meeting, it's in the supplemental appendix of 55, it says, John Jay and Stéphane Desjardins just informed me they're going to meet with Sid. They're going to encourage Tilster to sell. Sales is prepared to serve a 90-day termination of this dealership. And then on January 8th, originally they were going to tell Tilster, look, if you don't give us an answer by January 15th, we're going to commence our cancellation procedures. That email is plaintiff's appendix 15. But we never told them. What they needed out of us is an express statement that if you don't sell by January 1st, you're fired on January 1st. We never intended to violate the agreement. That only goes to anticipatory repudiation. And to get into anticipatory repudiation, we would have had an unequivocal expression that we're going to violate the agreement. We simply said to you, we're going to terminate your agreement. There was never a date specific. They're trying to make up this immediate territory change. In Tilster's own testimony, which is supplemental appendix 99, I asked him, I said, so the territory change was still going to happen in the future as of January 8th, 2010, after the January 1 deadline passed? Answer, correct. And there was no final date as to when the territory change would happen? Answer, correct. There was never a date. If there wasn't going to be a voluntary sale, there's no evidence in the record that we were not going to follow our termination provisions. The only way you can stop selling a BMATIC is if there's a woman, and she testified at a trial named Carrie Bennett, and when she's told that there's a termination, going to be a termination, she writes a letter, she gives the people 90 days, and at the end of the 90 days, she cancels them. In this case, that never happened. What they did was, on March 19th, Carrie was told that there was a sale. She wrote, inactive. The dealership agreement is still in place today. It's never been canceled. He continued to operate under the dealership agreement after the sale to Dortmans because he had warranty returns and he made money off the agreement. He needed to repudiate the agreement. We needed to expressly say that we're not going to follow the agreement. We didn't. There's no anticipatory repudiation. There's no constructive termination without economic duress. If you read the John Deere decision, it answers this case. It's about a five-page decision. You literally could cut and paste out John Deere for BMATIC and JPM for Telstra, and Judge Evans nailed it. He said you can't have a constructive termination where there's a voluntary sale. There's four elements of economic duress. None of them were approved, and that's what you needed for a forced sale. Now, quickly, I'll talk about DALRA. In this case, there's no evidence as to goodwill, the price of goodwill in the marketplace. There was no market study done. The most anyone's ever paid for goodwill is $200,000. Besides, Dortmans have paid $310,000. The market is simple. Everyone agreed that to calculate goodwill, you needed three times one year's net profit. The reason Dortmans paid $310,000 is because their net profit was 5% margin. His was 20% because he was overcharging. There's no market analysis in the record that would sustain a finding that anyone else could operate like he was doing. The numbers stopped on May 31, 2009. Nine months before the sale is when the expert simply looked at the financial records and concluded because Telstra could operate under these conditions, a new buyer could. And there was no evidence BMATIC would approve any other buyer. And so it was a false premise to believe that Telstra could sell to anyone but BMATIC. Thank you. Okay. Thank you, Mr. Gleiser. Mr. Antonowitz? Thank you, and good morning. There's a lot of corrections, I think, of the statements made by opposing counsel that I would like to address. But one of the statements that Mr. Gleiser made this morning is that if you shrunk the dealership to zero, it would be a constructive termination. And in looking at that, the evidence is very sufficient to the jury, that went to the jury, for the jury to draw the inference that that is indeed exactly what they did. The three key pieces that I would like to address, number one is that there is the October 26th email from Stephan Desjardins to Mr. John Jay, in which he says, I have an idea to share with you. We approach Sid again and ask him to sell. If he refuses to make it too difficult, we would, in the short term, modify the territory lines in favor of Vance and Dortmans. This would become a concrete commitment to those dealers and put unbearable pressure on Sid without canceling him outright or immediately. So there's the plan. Mr. Gleiser says, well, they never implemented the plan. The jury found and drew the inferences that they indeed did implement the plan. How did they implement the plan? They called Mr. Telstra and they said, we want a meeting with you. And that meeting occurred on November 16th of 2009 at the meeting with Mr. and Mrs. Telstra and Mr. Jay and Mr. Desjardins. At that meeting, they said, we're going to take away your territories unless you sell to the Dortmans, not to somebody else, not put it up for sale to the Dortmans. Make it quick and make it reasonable. Now, there have been prior negotiations with the Dortmans. By the way, they also may admit that they gave a deadline. We want the agreement by December 1, and we want it implemented and closed by January 8. But that really didn't happen, and there were no repercussions on that, because Telstra responded and said, you know, we need time. These things take time. We want to make it reasonable. We want to make sure we work out a fair deal. It did, in fact, happen in a manner. And, again, this is what was before the jury. No, but all I'm saying is in terms of the deadline that was given, it was not met, and there were no immediate repercussions. Telstra asked for additional time to try to work out the details and make sure it was fair, get a fair price and that kind of thing. You're correct to the extent that there was no deal reached in that time period, but there were repercussions in that time because of that. During that time period between November 16 and January 8 of 2010, there were meetings with the Dortmans, both by Beaumatic and by the Telstras, and there are e-mail communications, which were before the jury, in which Mrs. Dortman's e-mailed Beaumatic and said, what are you going to do? He doesn't get it. Do something to make sure that he gets this. He doesn't understand what's going to happen to him. He won't meet, he won't accept our price. And do something. Well, they did do something. They came back with a letter on January 8, 2010, and it states, we met back on November 16, 2009 to inform you that Beaumatic LLC decided to make distribution changes, decided, past tense, to make distribution changes in southwestern Ontario and have Dortman's Brothers take over the territory covered by your company. That's all the territory. We're going to have them take over your territory. At that time, we also mentioned to you that we were seeking a tentative deal with Dortman's Brothers by December 1, 2009, for an official takeover date of January 1, 2010, saying you passed your deadline and we have made this decision. We would like to know what the status of your negotiations with Dortman's is. We have to make you aware that our decision to change our distribution channel in southwestern Ontario is not negotiable and that we will proceed with or without your cooperation. So the consequences of his not accepting the Dortman's deal that they put on the table was that we are proceeding now, we've made the decision, we're proceeding now, and basically you've got a very short time. It was the very next week, and now I listen to Mr. Glazer say he continued as a dealer for months and months and months. In fact, he's still a dealer today, which I have a hard time understanding that logic based on the evidence. But it was the following week, the week following the January 8th letter, that there was a deal that was signed, an intent that was presented to Bomatic saying we've reached a deal. Now the other time that passed between then and March 1st of 2000, or I think it was March 3rd of 2010 when the actual closing of the sale occurred, but that was time taken for, you know, adjusting the inventories and working out a couple of the provisions on the final closing documents. But that deal was reached, and it was reached on Dortman's terms. And the point here is that Bomatic worked with Dortman's and they forced Sid Tilstra to accept the terms that were laid on the table by Dortman's. This wasn't an exercise in trade. What are the Tilstras doing now? You said, he said, they're still dealers. What are they doing? Tilstras are not operating any dairy equipment business. Tilstra Dairy Equipment exists as a corporate entity. Mr. Tilstra is, in fact, retired and driving and delivering trucks, which has nothing to do, again, with the industry. He's left the industry. At the time of closing, that was it for his dealership, other than there were still some accounts receivable from Bomatic for warranty repairs and things that were coming through and some customer receivables. Let me ask you this. Why was it wrong to strongly encourage Tilstra to sell in advance of termination? If Bomatic had good cause, because you were saying the customers were complaining, it could have terminated within 90 days' written notice. And if Tilstra hadn't sold, it would have received no compensation. So why was it wrong for Bomatic to encourage Tilstra to sell? Wasn't that to Tilstra's benefit? Well, first off, there was no good cause. And what we have here is a suggestion by counsel that there was good cause to terminate based on one hearsay memo that was in there. This would be an entirely different case. Had they exercised the termination provisions in Paragraph 4 of the dealer agreement, Paragraph 4 says if Bomatic can terminate upon good cause in 90 days' notice to the dealer. Had they done that, we would have been before the court arguing whether or not there was good cause and whether it was a proper termination under Paragraph 4. During the entire time that Mr. Tilstra was a dealer, he was never, ever told that he was in default of the contract or that Bomatic had good cause. In fact, if you refer back to the January 8th letter that I read to you, it says we have chosen to make distribution changes in your territory. It doesn't say that you have failed us, you've given us good cause. We didn't argue the good cause at the trial. There was no evidence of good cause at the trial because that's not how they proceeded. They proceeded and said we're going to put unbearable pressure on Tilstra to sell by taking his territory away. So we didn't have the opportunity to fight the cause of Paragraph 4 because they were using Paragraph 3 of the contract. Paragraph 3 is one that says you have an exclusive territory and you cannot solicit sales except in your exclusive territory without Bomatic's express permission. They were using that cause to avoid using Clause 4, which is where if they felt they had good cause, they should have done that. So they're asking us to accept that there was good cause to terminate even though that issue wasn't tried. What was tried was whether or not there was a breach of the duty, implied duty of good faith and fair dealing in this matter. So it kind of confuses the issue a little bit because of the after-the-fact revisions that have been made. They're saying, well, ignore what we did because we would have had good cause anyway and because Tilstra jumped the gun, and he jumped the gun based on a letter that said we've already decided you're done. Now, I would also just briefly like to talk about JPM versus John Deere, which Mr. Glazer said that is on all fours. It's not on all fours. There are a number of differences with the JPM. One is JPM was brought under a theory and it was put under the theory of economic duress, and the court specifically said, you know, we're looking at this because it's economic duress. We didn't plead economic duress. Two, JPM case has a gap in time where the court said you had plenty of time to go and find relief and address the situation. You didn't need to jump right into a sale. You know, you had months at issue here. That's not the case here with the BMATIC. You have to look at the January 8th communication that says, we have decided, past tense, it was over. It's not negotiable. It's over. We've decided we're doing it. And yes, they didn't put a specific date, said it's over as of January 9, but the implication is there, and the jury is well-equipped to draw the inferences necessary. They don't have to draw the same inference that Attorney Glazer has drawn in it. A final difference with JPM is that JPM was a Wisconsin Fair Dealership Law case, and there's an important distinction in that because the Wisconsin Fair Dealership Law specifically provides for injunctive relief and also makes a presumption of irreparable harm, which was addressed by the court in its decision. Because Mr. Tilstra's business was not situated in the state of Wisconsin, this could not be a Wisconsin Fair Dealership Law case, which is why it was brought under the contractual theories that it was brought under rather than the Fair Dealership Law. So, I mean, there's some very important distinctions. Mr. Tilstra was gone in January. I mean, he read that letter. The jury read that letter as saying he's gone. I think what we need to look at is, was there sufficient evidence for the jury to draw the conclusions that it did? And there certainly was. The jury had all the proper evidence. The trial judge looked at it several times. The trial judge agreed that that evidence was there, and they could draw the inferences that they drew. They don't have to agree with Mr. Glazer that this was some unannounced future event, I think. So I don't... The last argument that's been raised is the Daubert argument that Mr. Glazer raised. This is far from a Daubert violation from what happened. We had an expert witness as to damages. Ron Schinella from Canada, who was a chartered business valuator, a chartered accountant, who used generally accepted accounting principles, capitalized earnings methods to determine a valuation. The district court pointed out that he looked at various factors in the dairy industry market. I'm out of time. Thank you very much. Thank you, Mr. Adler. Mr. Glazer? Thank you. Quickly on Daubert, I had the expert admit at trial that his opinion was unreliable to a buyer, and that was the question before the jury. So he admitted you could not rely on the opinion. But wasn't it it would be unreliable unless the buyer conducted due diligence, which could then still support the valuation or not? Correct, but there was no due diligence. He said a buyer could not take that opinion and make a decision, and that's what the jury was asked to do. But how is that the standard for Daubert? Because an expert relies on different things in making a determination, and a buyer would and an expert is able to say, I'm going to rely on things that it's accepted within my field of expertise to rely upon, including financial statements and other materials that are prepared by other people. That wasn't the due diligence. The due diligence was finding out whether or not the amount of net profit could be maintained, and that was not done. With respect to John Deere, John Deere clearly says... Before you go into John Deere, is Mr. Antonello correct that you didn't present... Good cause. ...a good cause evidence to the jury? There's no requirement on the agreement. Did you or did you not? We never got to the termination clause. There's nothing in the agreement that requires us to... Did you put evidence of good cause before? In the trial? Yes. Yeah. The evidence was he had lacked integrity because he had stolen from Velmatic, he had stolen from another dealer, he had lied to another dealer, and he had cheated customers. So there was lack of integrity as good cause, but that was never in front of the jury. I just want to close by saying... But the jury rejected it. No, the jury was never asked to find good cause. That wasn't part of the case. I don't understand. You presented evidence of good cause, but it was not submitted to the jury as an issue? The issue in the case was not good cause because we never got to termination. Wait, I don't understand you. Sure. You have argued to us that you had good cause to terminate him, but you say... but apparently you did not argue this to the jury? The case wasn't... Why are you arguing something to us that you didn't argue to the jury? That's my question. The good cause issue doesn't come into play because good cause is only... But then why do you argue it to us? Because he's saying we had some ulterior motive and that we wouldn't have had good cause. But, no, did the testimony... Support good cause. ...about him lying, according to you, and not fulfilling the conditions of what he was supposed to do for the various customers, was that evidence? Yeah, it's in the record and cited in my brief. Okay, so the evidence was there. Correct. But you did not argue that it was bad faith? Correct. We told him simply that we wanted to change this distributor. We never got into the good cause, and there's no requirement under the agreement to ever communicate to him why we have good cause. We just cannot terminate before we issue a 90-day notice, and that has to be on good cause. But we don't have to tell him why we're firing him. But you didn't tell him that it was because of good cause either. Is that correct? Right, and there's a case that says that you don't need to. The Baraha case, 956 F2D, says F2D 1436, which is cited in our brief. So then why did you put that evidence in? Why? Yeah. If it wasn't an element and it was unnecessary and you're telling us now it's irrelevant, why did that evidence even go before the jury? The evidence came in through Tilstra. What, what? Tilstra testified? Tilstra tried to create a review. Don't interrupt me, would you please? Excuse me. Are you saying Tilstra testified that you had good cause to cancel it? No, Tilstra raised the argument that we weren't going to have good cause, and then also Tilstra brought in the John Jay report and claimed that the John Jay report was retaliatory. And the good cause issue actually also would have gone in as the damages as well because another point is that the whole case is premised on his having an unending ability to sell, but there was concurrent compulsion for him to sell because if he didn't sell to Dortmans, he would have been fired within 90 days. So he didn't have the opportunity to sell to a third party. So they raised the issue, okay, but you didn't put the testimony in in the first instance. And so then this testimony came in after they had raised the issue? They claimed that we didn't have good cause, and so we put an issue that we did. And then you put the evidence. Would that come in in your case in chief, or did that come in in cross-examination? The main part of the good cause came in our case in chief. And then you argued it as it related to valuation. Yeah, we said that they would have been terminated anyway. So they didn't have the choice to stay in business indefinitely because they would have been terminated. So your argument went to damages? And also the argument was that we would have been able to terminate on good cause, and that's why we weren't acting in bad faith because we just simply before we implemented termination procedures, we told them, do you want to sell? If we had no good cause, if there was never any good cause, then potentially threatening someone with a termination without good cause, I mean, that creates a whole separate set of issues. But we always, in the John Jay memo, he laid out a whole bunch of problems, and he said I'm going to recommend termination, and between that memo and the meeting they decided let's not go the termination route, let's hold off the 90-day notice, and instead let's give them the opportunity to sell. When did you tell Tilstra that you were going to terminate them for good cause? We didn't. We never had to. Okay. So they didn't know whether you were doing it just out of spite or because of the reasons that are cited in the memo? The only reason we told them was we wanted to have larger dealers. But under the Berha case, that's not a basis. If you have good cause, you don't violate it by giving a different reason. We were trying to do a soft sell, like, look, we're going to bigger dealers. It's a good idea to transition out, get some money. We didn't want to make this ugly. We thought it was a nice deal. He said it's a fair deal. We were shocked when he sued us two years later. Okay. Well, thank you very much, Mr. Glazer and Mr. Antonelli. Thank you.